2018 PA Super 43

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JERMAINE DALTON CROSLEY | : | |
| | : | No. 2049 EDA 2017 |
| Appellant | | |

Appeal from the Judgment of Sentence May 23, 2017
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0002462-2016

BEFORE: BENDER, P.J.E., PANELLA, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:                    **FILED FEBRUARY 28, 2018**

Appellant, Jermaine Dalton Crosley, appeals from the judgment of sentence entered in the Court of Common Pleas of Delaware County after the court, sitting as finder of fact in Appellant's bench trial, found him guilty of, *inter alia*, third degree murder in connection with the fatal shooting of Shawn Mitchell. Sentenced to an aggregate sentence of 120 to 300 months' incarceration with a 14-year probationary tail, and ordered to pay $7,864.72 of restitution to the Pennsylvania Victim's Compensation Fund, Appellant files the present appeal raising challenges to the sufficiency of the evidence, the admission of prior bad acts evidence, and the propriety of restitution. We affirm.

The trial court aptly sets forth pertinent facts as follows:

The evidence, viewed in the light most favorable to the Commonwealth, [established that the] victim, Shawn Mitchell, lived with his wife and children at 501 Timberlake Road in Upper

_____
* Former Justice specially assigned to the Superior Court.

Darby. N.T., 4/4/17, at 5. In December of 2015, the Defendant [hereinafter "Appellant"] began to live in an outside shed that was attached to 501 Timberlake. Appellant lived in the shed with the Victim's permission. He was not, however, allowed unaccompanied access to the house and did not interact with other members of the Mitchell family. Occasionally, when the nights were cold, Appellant was allowed to sleep in the basement but only when the Victim gave him permission to enter the home. N.T., at 5-7, 26.

On March 12, 2016, at about 2:15 p.m., Nhashara Samuels-Mitchell, the Victim's wife, was preparing to go to work and discussing Appellant's presence in the shed with her husband. The Victim told Ms. Samuels-Mitchell that the Appellant had jumped off a deck that was adjacent to the kitchen to the yard below. Ms. Samuels-Mitchell told her husband that she wanted the Appellant "out" and would not wait any longer. *Id.*, at 8-26. This conversation took place in the second-floor bathroom. Ms. Samuels-Mitchell testified that she and her husband owned a gun but that she saw no sign that her husband was armed during their conversation. *Id.*, at 11, 28.

The Victim left Ms. Samuels-Mitchell and went to the basement. Appellant was in the basement. Ms. Samuels-Mitchell remained in the bathroom and stepped into the shower. While she was in the shower she thought that she heard a gunshot. *Id.*, at 25-26. She called to her eight year-old daughter, I-Shan, and told her to get her dad. *Id.*, at 13, 27, 44-48. I-Shan went to the first floor and called out to the Victim. He answered her from the basement. I-Shan started down the basement steps and peeked around a partial wall. She saw two men, Appellant and her father, struggling with their hands on a gun. *Id.*, at 48-58. Her father was asking Appellant to give him the gun and "let's sit down and talk about . . . what you just did." *Id.*, at 51. Appellant did not speak.

I-Shan left and ran upstairs to her mother and told her that Appellant and the Victim were fighting. *Id.*, at 51. Ms. Samuels-Mitchell ran from the shower to an upstairs window. From there she could see Appellant chasing the Victim and shooting at him in the alley below.[fn] *Id.*, at 13-14, 30. She yelled at Appellant to "stop," and Appellant paused, turned toward her and said, "he takes me for a fool," and took another shot at the Victim. *Id.*, at 31. Appellant began to run back toward the house and Ms.

- 2 -

Samuels-Mitchell ordered her children out of the house and told them to get help. *Id.*, at 16-17, 51. She quickly dressed and found her husband down the street from their home. He was lying on the sidewalk with "a hole in his chest." *Id.*, at 19-23.

> [Fn]. "Johnny" Stellabotte testified that at the time of the shooting he was helping his father make repairs to a home that was owned by his grandmother. He was in the alley sitting in his father's truck and saw one man running after another shooting a gun. He heard screaming and saw gunfire. Stellabotte identified Appellant as the shooter from a photo array. N.T., 4/4/17, at 16-85.

Ms. Samuels-Mitchell and I-Shan gave statements immediately after the shooting and before they knew that the Victim had succumbed to his wounds. Ms. Samuels-Mitchell identified Appellant as the man who was living in the shed and who she saw chasing her husband and shooting at him. *Id.*, at 20-22; N.T. 4/5/17, at 34-35.

I-Shan was also interviewed by Detective Leo Hanshaw in a conference room at the Upper Darby Police Station. N.T., at 35. I-Shan was upset but "handling the situation well." She was not aware of her father's condition. Her statement included the following:

> "I went downstairs onto the deck and called for my dad. He answered from the basement and then I went down the basement steps and saw him wrestling with the man who was, who's been staying in our basement. I saw both of them with the gun fighting over it, they both had their hands on the gun."

*Id.*, at 39. She heard her dad tell the man to give him the gun and the "other guy said nothing." In response to a follow-up question regarding whether she saw the man shoot her father, she stated: "all I saw is the guy's hand and the gun, I heard the gun go off about three times, I also saw the bullets that were coming out of the gun." *Id.* at 41.

Appellant was arrested the next day, March 13th. At the time of his arrest he had a laceration on his right hand but no other visible injuries. *Id.*, at 52, 59. After Appellant waived his ***Miranda***[fn]

rights he gave a statement. At the outset, Appellant stated that the Victim had pulled a gun on him while two men were holding him in the basement and he described an incident with the Victim and the two other men. *Id.*, at 82. When asked whether something had happened the day before the shooting Appellant said that he had disarmed the Victim and hid the gun [in] an alley about a block away from 501 Timberlake Road. *Id.*, at 84.

---

[fn] *Miranda v. Arizona*, 384 U.S. 436 (1966).

---

Appellant then agreed to take the officers to the location of the gun. He was driven back to the alley and he directed the officers to the rear deck of 446 Timberlake Road where a .357 stainless steel Rossi revolver covered in a plastic bag was hidden underneath a PECO box underneath the deck of the home. Newspaper was shoved in and around where the gun was hidden. N.T. 4/3/17, at 11-22. Nearby, hidden by a blue trashcan beneath rocks and debris two spent casings and two live rounds were found, also at Appellant's direction. *Id*.

Shawn Mitchell died as a result of his wounds. Dr. Albert Chu of the Philadelphia Medical Examiner's Office testified that a bullet went through his left arm and that the presence of soot residue and a muzzle imprint allowed him to conclude that the shot was fired at close range, about an inch from the body. A bullet was recovered from his left flank and that bullet entered the left side of his chest and travelled through his left lung, spleen, pancreas, stomach, superior mesenteric artery and inferior vena cava. N.T. 4/6/17, at 4-24. The entry wound was "atypical" in that it entered the body sideways, leading Doctor Chu to conclude that a single bullet passed through the left arm, entered the Victim's chest and came to rest where it was recovered from the Victim's flank. *Id*. A second bullet was discovered embedded in the basement wall. N.T. 4/5/17, at 23-29. Both bullets were fired from the 357 magnum Rossi firearm that was hidden at 446 Timberlake Road. *Id.*, at 125. Fingerprints from the index fingers of Appellant's left and right hands matched fingerprints from the barrel of the gun. *Id.*, at 128.

Appellant testified at trial [as follows:] On March 12, 2016, he was living in the shed adjoining the basement of 501 Timberlake Road. N.T. 4/6/17, at 39. Appellant acknowledged the fact that

- 4 -

he was never allowed in the house alone without Mitchell. *Id*., at 43-47. He knew that Mitchell had a gun in the house and testified that Mitchell had threatened him with it on other occasions. *Id*., at 48-49.

He testified that on the day of the shooting he volunteered to clean the deck and that Mitchell led him through the kitchen and locked the door behind him making it impossible from him to re-enter the house. *Id*., at 57. He was getting cold and couldn't get back inside so he jumped from the deck and entered the house through the basement door. *Id*., at 59. He was in the basement when Mitchell appeared from upstairs, angry and cursing and carrying a gun. *Id*., at 61. Appellant testified that he thought Mitchell was going to kill him because he had threatened him with the gun before. *Id*., at 63. He testified that it was he who pleaded with Mitchell to "take it easy," to "calm down," and "don't do it," when he heard an explosion from four or five feet away. *Id*., at 64.

Appellant claimed that he thought Mitchell shot him. He claimed that he grabbed the gun only after Mitchell fired at him a second time and that he did not fire the gun. *Id*., at 65-66, 83. He testified that he ran with the gun in hand but did not chase Mitchell and did not shoot at him and in fact never fired the gun. *Id*., at 71, 84. He hid the gun because he was "scared" and confused.

He slept in a park the night of the shooting and didn't "get a chance" to call the police and explain his circumstances before he was arrested although he did have a cell phone. *Id*., at 88. Appellant testified that he believed that Mitchell wanted him out of the house because Mitchell would "sell weed, like 50 pounds into a big bag and coke sometimes." He claimed to have called the police to report the mistreatment and threats that he suffered at Mitchell's hands and that Mitchell believed the police might investigate and discover the contraband. *Id*., at 90.

Trial Court Opinion, filed 9/7/17, at 4-9.

Police charged Appellant with First Degree Murder, Third Degree Murder, Persons Not to Possess Firearms, and Possession of an Instrument of a Crime.[1]

Prior to trial, the Commonwealth filed a Motion in *Limine* asking the court to

---

[1] 18 Pa.C.S. §§ 2502(a), 2502(c), 6105, and 907, respectively.

consider whether Appellant's prior conviction for aggravated assault would be admissible at trial to rebut any defense evidence suggesting victim was a violent person or that he initiated the altercation at issue. After a hearing on the matter, the court ruled Appellant's prior conviction admissible as rebuttal evidence.

On April 6, 2017, Appellant's four-day bench trial culminated with a verdict of guilt on charges of Third Degree Murder and Persons Not to Possess Firearms. On May 23, 2017, the court sentenced Appellant as noted *supra*. This timely appeal followed.

Appellant presents the following questions for our consideration:

> **I.    WHETHER THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE CONVICTION FOR THIRD DEGREE MURDER SINCE THE COMMONWEALTH FAILED TO PROVE, BEYOND A REASONABLE DOUBT, THAT MR. CROSLEY (1) COMMITTED A KILLING OR (2) THAT HE DID SO WITH MALICE?**
>
> **II.   WHETHER THE LOWER COURT ERRED IN PERMITTING THE COMMONWEALTH TO INTRODUCE APPELLANT'S PRIOR AGGRAVATED ASSAULT CONVICTION SINCE IT WAS NOT ADMISSIBLE AS CHARACTER EVIDENCE?**
>
> **III.  WHETHER THE ORDER OF RESTITUTION IS ILLEGAL SINCE IT WAS UNSUPPORTED BY THE RECORD AT SENTENCING?**

Appellant's brief, at 6.

Appellant contends, first, that the Commonwealth failed to prove beyond a reasonable doubt that he shot Shawn Mitchell, let alone that he did so with malice. Even viewing the evidence in a light most favorable to the

Commonwealth as verdict winner, Appellant maintains, "it remains unclear who initiated the confrontation, how the struggle began, or who introduced the firearm." Appellant's brief, at 18. Whether Appellant may have shot Mitchell, Mitchell may have shot himself, or the shooting was the result of an accident as the two men wrestled was undeterminable from the evidence admitted at trial, Appellant continues. *Id*. According to Appellant, two eyewitness accounts that an armed Appellant chased Mitchell down a street while firing shots at him "had no bearing on what happened in the cellar, where the government argued that the fatal shot occurred." *Id*.

Our standard of review of a sufficiency of the evidence claim is well settled:

> Our standard of review is whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to enable the fact[-]finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt.

***Commonwealth v. Cruz***, 71 A.3d 998, 1006 (Pa. Super. 2013) (citation and brackets omitted).

> In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. . . . Furthermore, when reviewing a sufficiency claim, our Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Gibbs*, 981 A.2d 274, 281 (Pa. Super. 2009) (citation omitted). Finally, "the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Melvin*, 103 A.3d 1, 40 (Pa. Super. 2014) (citation omitted).

This Court has further noted:

> [T]o convict a defendant of the offense of third[ ]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but [also a] wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013) (citations omitted). "[I]t is well established in Pennsylvania that a fact finder may infer malice and a specific intent to kill from the use of a deadly weapon upon a vital part of the victim's body." *Commonwealth v. Cruz*, 919 A.2d 279, 281 (Pa.Super.2007).

The evidence of record reveals that Shawn Mitchell's daughter, I-Shan, testified that as Mitchell and Appellant struggled for control over the gun they each partially held, Mitchell pleaded with Appellant to desist so they could talk things over. Appellant said nothing in reply, and I-Shan observed Appellant's hand on the gun as a shot was fired into Mitchell's torso from about one inch away.

Moments later, both Samuels-Mitchell and a neighbor who was outside at the time witnessed Mitchell running down a nearby alley with Appellant in armed pursuit, firing the gun as he gave chase. Samuels-Mitchell called for Appellant to stop, but Appellant responded "he takes me for a fool" and fired another round at Mitchell.

Viewed in a light most favorable to the Commonwealth as verdict winner, the evidence enabled the finder of fact to conclude reasonably that Mitchell did not incur an accidental gunshot wound; he was, instead, shot deliberately by Appellant during their struggle in the basement. Indeed, it is well-settled that even the uncorroborated testimony of a single witness may alone be sufficient to convict a defendant. *Commonwealth v. Kearney*, 601 A.2d 346, 349 n.6 (Pa.Super. 1992). Here, the testimony of three eyewitnesses sufficed to establish that Appellant's conduct during the entire relevant period reflected, at the very least, a recklessness of consequences and a mind regardless of social duty. The testimony of I-Shan, Mitchell's daughter, cast Appellant as an aggressor who fired the fatal shot in disregard of Mitchell's request that they desist and talk things over. Samuels-Mitchell testified that, moments after she heard the gunshot, Appellant pursued Mitchell down an alley while firing more shots and claiming retribution. A third witness observed the same scene in the alley. Finally, an inference of malice also arises from Appellant's use of a deadly weapon on a vital part of Mitchell's

body. *See Cruz*, *supra*. For all these reasons, we reject Appellant's challenge to the sufficiency of the evidence.[2]

Next, Appellant contends that the court erred when it permitted the Commonwealth, over pretrial objection, to introduce evidence of Appellant's recent conviction for Aggravated Assault to rebut defense evidence that Mitchell had assaulted him and threatened him with a gun in the past.

"Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the court's decision on such a question absent a clear abuse of discretion." *Commonwealth v. Hernandez*, 862 A.2d 647, 650 (Pa.Super. 2004) (citations omitted). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Henkel*, 938 A.2d 433, 440 (Pa.Super. 2007).

Our rules of evidence provide, generally, that "evidence of a person's character or character trait is not admissible to prove that on a particular

_____

[2] To the extent that Appellant bases his sufficiency challenge on inconsistencies between the eyewitness's testimonies and his own testimony, we observe that a sufficiency review does not include an assessment of the credibility of witness testimony or other evidence, *Commonwealth v. Wilson*, 825 A.2d 710, 713 (Pa.Super. 2003), and that testimonial conflicts will not render evidence insufficient. *Commonwealth v. Hargrave*, 745 A.2d 20, 22 (Pa.Super. 2000).

occasion the person acted in accordance with the character or trait."  Pa.R.E. 404(a)(1).  One relevant exception to this rule, however, provides that a criminal defendant may offer evidence of an alleged victim's pertinent[3] character trait, Pa.R.E.  404(a)(2)(B), and may prove this trait by specific instances of conduct.  *See* Pa.R.E. 405(b)(2), discussed *infra*.  Specifically, the comment to Pa.R.E. 405 instructs:

> With regard to criminal cases, under Pa.R.E. 404(a)(2)(B), the accused may offer evidence of a pertinent trait of character of the alleged crime victim.  Under Pa.R.E. 405(b)(2), the trait may be proven by specific instances of conduct without regard to whether the trait is an essential element of the charge, or defense.  This is consistent with prior Pennsylvania law.  **See Commonwealth v. Dillon**, 528 Pa. 417, 598 A.2d 963 (1991).

Comment to Pa.R.E. 405.  In accordance with these rules, Appellant testified about instances when Mitchell had acted violently toward him without provocation.

Where a defendant chooses to offer such evidence, the rules provide that the Commonwealth may "offer evidence to rebut it; and offer evidence of the defendant's same trait."  Pa.R.E. 404(a)(2)(B)(i) and (ii).   The comment to Rule 404 explains:

> For example, in an assault and battery case, if the defendant introduces evidence that the alleged victim was a violent and belligerent person, the Commonwealth may counter by offering evidence that the defendant was also a violent and belligerent person.  Thus the jury will receive a balanced picture of the two participants to help it decide who was the first aggressor.

---

[3] "Pertinent" means relevant to the crimes charged.  **Commonwealth v. Minich**, 4 A.3d 1063, 1071 (Pa.Super. 2010).

Comment to Pa.R.E. 404.

However, whereas Rule 405, "Methods of Proving Character,"[4] permits the defendant to offer specific act evidence to prove the character of the alleged victim, *see* Rule 405(b)(2), it confers no analogous or similar right upon the Commonwealth.  As such, the Commonwealth remains subject to Rule 405(b)'s general prohibition against the admission of specific instances of conduct to prove character or a character trait in rebuttal.  The rule-based scheme, therefore, limits the Commonwealth to proving the defendant's

---

[4] Rule 405 provides, in pertinent part:

**Rule 405.  Methods of Proving Character**

**(a)** **By Reputation.**  When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation.  Testimony about the witness's opinion as to the character or character trait of the person is not admissible.

\*\*\*

**(b)** **By Specific Instances of Conduct.**  Specific instances of conduct are not admissible to prove character or a trait of character, except:

\*\*\*

(2) In a criminal case, when character or character trait of an alleged victim is admissible under Pa.R.E. 404(a)(2)(B) the defendant may prove the character or character trait by specific instances of conduct.

Pa.R.E. 405(a), (b)(2).

character trait with testimony about the defendant's relevant reputation, pursuant to Rule 405(a).[5]

Therefore, contrary to the trial court's opinion and the Commonwealth's position, there is no specific statute or rule of evidence that permitted the Commonwealth to rebut Appellant's testimony about Mitchell's prior acts of violence toward him with evidence of Appellant's prior conviction for aggravated assault. Under the rules, the Commonwealth's options were, instead, limited to calling a rebuttal witness to testify to Appellant's reputation for violent or malicious behavior, pursuant to Rule 405(a), and calling a character witness to testify to Mitchell's reputation for peaceable conduct.[6]

Nevertheless, we decline to vacate judgment of sentence and remand for a new trial where another basis supported the admission of the Appellant's prior conviction. **See Commonwealth v. Charleston**, 16 A.3d 505, 528-529 (Pa.Super 2011) (affirming trial court's decision regarding admissibility of evidence even though trial court's reasoning was unpersuasive since this Court may affirm the decision of the trial court on any basis), *abrogated on other grounds by* **In re L.J.**, 79 A.3d 1073 (Pa. 2013). **See also Commonwealth v. Lauro**, 819 A.2d 100, 105 n. 8 (Pa.Super. 2003); **Commonwealth v.**

---

[5] Though not relevant to the resolution of the present issue, we note that Rules 405(a)(1) and (2) permit cross-examination of a reputation witness to include reasonable inquiry into relevant specific instances, to gauge the witness's familiarity with the subject person's history.

[6] Though not involving the rules of evidence in question, the Commonwealth was also permitted to cross-examine Appellant as to his testimonial veracity and his capacity to have perceived Mitchell's alleged acts accurately.

- 13 -

*O'Drain*, 829 A.2d 316, 322, n. 7 (Pa.Super. 2003) ("this court may affirm the decision of the trial court if there is any basis on the record to support the trial court's action; this is so even if we rely on a different basis in our decision to affirm").

During Appellant's testimony on direct examination, he presented an overarching narrative in which Mitchell would periodically threaten him with violence, sometimes at gunpoint, yet he would manage to either calm Mitchell down or escape the scene altogether. This dynamic repeated on the day of the shooting, Appellant maintained, with Mitchell acting as the armed aggressor and Appellant trying to reason his way out of imminent harm. The moment culminated, Appellant said, with Mitchell firing at Appellant, Appellant grabbing Mitchell's hand and gun while asking him to relent peaceably, and, finally, the gun firing again as they struggled with one another. Mitchell released his grip, and Appellant fled with the gun for fear of his own life, he testified.

Amid this testimony in which he disavowed ever acting or speaking violently toward Mitchell, he volunteered his character for nonviolence where he specifically denied having ever before possessed a weapon:

> I got scared. I didn't want nobody to see me with any weapon because I never, I never hardly has a weapon, I never carry a weapon. I never carry a weapon before so I didn't want nobody to see me with a weapon so I was going to throw it [the handgun in question] in the trashcan.

N.T. 4/6/17 at 72. Appellant offered this statement during his explanation of why he ran with the gun and hid it immediately after the shooting.

- 14 -

Our jurisprudence permits the use of a defendant's prior non-*crimen falsi* conviction where it is limited to the specific rebuttal of the defendant's unsolicited testimony of his good character. **Commonwealth v. Hernandez**, 862 A.2d 647, 652 (Pa.Super. 2004) (upholding admission of PWID defendant's prior PWID conviction where defendant testified "since I've been a junkie, I don't sell drugs."); **Commonwealth v. Trignani**, 483 A.2d 862, 869 (Pa.Super. 1984) (holding prior conviction for aggravated robbery admissible where defendant volunteered he never shot anyone in his life, an assertion belied by facts underlying prior conviction).

Here, the record shows that Appellant pleaded guilty one year earlier to Aggravated Assault, a felony of the second degree, on allegations that he threatened and attacked a security guard while holding a sharp object. *See* C.R., Exhibit 18. The use of this prior conviction in the present trial was, therefore, permissible to rebut Appellant's unsolicited character testimony that he never before carried a weapon. The record reflects that the Commonwealth admitted the guilty plea and certified copy of Appellant's prior conviction without further commentary. N.T. 115-117. Accordingly, we uphold the admission of Appellant's prior conviction, albeit on different grounds than that relied upon by the trial court.

Finally, Appellant contends that the Commonwealth provided inadequate evidence at sentencing to support its claim of restitution in the amount of $7,864.72. Hence, he claims, his sentence is illegal.

Although an award of restitution lies within the discretion of the [trial] court, it should not be speculative or excessive[,] and we must vacate a restitution order which is not supported by the record. Mandatory restitution, as part of a defendant's sentence, is authorized by 18 Pa.C.S. § 1106, which states, in relevant part:

§ 1106. Restitution for injuries to person or property

**(a) General rule.**—Upon conviction for any crime wherein property has been stolen, converted or otherwise unlawfully obtained, or its value substantially decreased as a direct result of the crime, or wherein the victim suffered personal injury directly resulting from the crime, the offender shall be sentenced to make restitution in addition to the punishment prescribed therefor.

* * *

**(c) Mandatory restitution.—**

(1) The court shall order full restitution:

(i) Regardless of the current financial resources of the defendant, so as to provide the victim with the fullest compensation for the loss.

* * *

(2) At the time of sentencing the court shall specify the amount and method of restitution. In determining the amount and method of restitution, the court:

(i) Shall consider the extent of injury suffered by the victim, the victim's request for restitution ... and such other matters as it deems appropriate.

(ii) May order restitution in a lump sum, by monthly installments or according to such other schedule as it deems just.

* * *

(4)

> (i) It shall be the responsibility of the district attorneys of the respective counties to make a recommendation to the court at or prior to the time of sentencing as to the amount of restitution to be ordered. This recommendation shall be based upon information solicited by the district attorney and received from the victim.
>
> (ii) Where the district attorney has solicited information from the victims as provided in subparagraph (i) and has received no response, the district attorney shall, based on other available information, make a recommendation to the court for restitution.

18 Pa.C.S. § 1106.

> An appeal from an order of restitution based upon a claim that it is unsupported by the record challenges the legality, rather than the discretionary aspects, of sentencing; as such, it is a non-waivable matter. The determination as to whether a trial court imposed an illegal sentence is a question of law; an appellate court's standard of review in cases dealing with questions of law is plenary.

*Commonwealth v. Rotola*, 173 A.3d 831, 834-35 (Pa. Super. 2017) (internal quotation marks, brackets, and citations omitted).

In both its May 15, 2017, pre-sentencing letter in lieu of a sentencing memorandum and at the May 23, 2017, sentencing hearing, the Commonwealth recommended that the court award $7,864.72 restitution to the Pennsylvania Victim's Compensation Fund. Counsel for Appellant received a copy of the letter and was present at the sentencing hearing. Neither in the letter nor at trial, however, did the Commonwealth provide an itemization of what expenses contributed to the restitution amount. At the conclusion of the sentencing hearing, the court awarded the requested restitution.

- 17 -

Appellant now contends his sentence is illegal because the Commonwealth failed to provide evidentiary support for the amount of restitution requested and awarded. In so doing, he cites ***Commonwealth v. Atanasio***, 997 A.2d 1181 (Pa.Super. 2010), for the proposition that the record must contain the factual basis as to the appropriate amount of restitution.

In ***Atanasio***, the defendant pleaded *nolo contendere* to simple assault for punching the victim in the face. At sentencing, the trial court awarded restitution for the victim's broken ankle, which was diagnosed three days after the assault. Defendant filed a motion to modify sentence in which he challenged the award of restitution. At the hearing, the defendant argued that the Commonwealth offered no evidence connecting the broken ankle to the assault in question. The court, however, replied that it was the defendant who had failed to prove the ankle injury was not related to the assault, and it denied the defendant's motion to modify sentence.

On appeal, we reversed and remanded for a new restitution hearing. It was the Commonwealth's burden, we explained, to prove the causal relationship between the victim's broken ankle and the punch the defendant delivered to the victim's face that resulted in his nolo contendere plea to simple assault. In denying the defendant's motion, the court had impermissibly shifted the burden of proof, we concluded.

Unlike in ***Atanasio***, the facts in the present case established a clear nexus between the crime and the victim's expenses that reasonably followed.

Specifically, the court acknowledged that although an itemized accounting of expenditures was not supplied to the court, a $7,864.72 restitution award to the Victim's Compensation Fund could not have been excessive under the factual circumstances established at trial and during the sentencing hearing. There was no dispute as to either Mitchell's transport to the hospital by ambulance or the hospital's surgical efforts rendered in an attempt to save his life, the court opined, nor could there be any reasonable objection that burial expenses inevitably followed.

It is apparent that an appropriate factual record supporting restitution was made in the presence of both parties during adversarial proceedings. Moreover, pursuant to Section 1106, the Commonwealth specified the amount and method of restitution at sentencing, and the court clearly considered the extent of injury suffered by the victim, the considerable efforts to save his life, and the inevitable expenses associated with disposition of the victim's remains. Based on this record, the court deemed the restitution award reasonable, and it pronounced Appellant's claim meritless. Because we agree, we reject Appellant's illegality of sentencing claim.

Judgment of sentence is AFFIRMED.

Judge Panella joins the opinion.

President Judge Emeritus Bender files a concurring opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:2/28/18